UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

GREG S. LOY,

        Plaintiff,

vs.

                                    Civil Action 2:09-cv-00307
                                    Judge John D. Holschuh
                                    Magistrate Judge E.A. Preston Deavers

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL
SECURITY,

        Defendant.

## REPORT AND RECOMMENDATION

### I. Introduction

      Plaintiff, Greg S. Loy, filed this action seeking review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for disability insurance benefits. The application, which Plaintiff filed on September 25, 2007, [1] alleged that he became disabled on September 30, 2003, as a result of severe back pain, a herniated disc, and high blood pressure. His last insured date for disability insurance benefits was December 31, 2009.

      After initial administrative denials of his claim, Plaintiff was afforded a hearing before an Administrative Law Judge ("ALJ") on October 23, 2008. In a decision dated November 7, 2008, the ALJ denied benefits. That decision became the final decision of the Commissioner when the

---

[1] Plaintiff initially filed an application for disability insurance benefits on August 8, 2006, which was denied on November 7, 2006.

Appeals Council denied review on April 3, 2009.

Plaintiff thereafter timely commenced this civil action.  The record of administrative proceedings was filed in this Court on June 24, 2009.  Plaintiff filed a statement of specific errors on July 24, 2009, to which the Commissioner responded on September 24, 2009.  Plaintiff filed a reply brief on October 6, 2009, and the matter is now ripe for decision.

## II. Plaintiff's Testimony

Plaintiff, who was 47 years old at the time of the administrative hearing, has an eleventh-grade, limited education.  His past relevant work was as a mechanical maintenance worker and repairer of heavy equipment.

On September 30, 2003, Plaintiff injured his back while lifting a transmission at work.  Plaintiff testified that he has had lower back pain since his injury.  (R. at 28.)  His pain is in the center of his lower back and is constant.  (*Id.*)  His treatment has included chiropractic care, epidurals, two back surgeries, physical therapy, electrical stimulation, and administration of heat/ice.  (*Id.*)

Plaintiff also testified that he cannot get a full night's sleep.  He used to snow ski, water ski, and play sports, but can no longer do any of those activities.  (*Id.*)  He helps out "a little bit" with household chores.  (R. at 29.)  He can wash the dishes or do laundry for about a half-hour to an hour before having to rest for one to three hours.  (*Id.*)  Plaintiff testified that he could sit for one hour at a time, stand for up to an hour at a time, and lift and carry twenty to thirty pounds. (*Id.*)

## III.  The Medical Records

Following his back injury at work, Plaintiff was initially evaluated in the Emergency

Room and admitted for five days.  He was treated with medications and an epidural steroid injection.  (R. at 279–92.)  An MRI of Plaintiff's lumbar spine taken during his hospital admission, revealed herniated discs at L4-5 and L5-S1; disc bulging, marked neuroforaminal narrowing, degenerative changes of the facet joints, and narrowing of the subarachnoid space; and disc bulging and neuroforaminal narrowing at L2-3.  (R. at 287–88.)  Dr. Gold, a consulting neurosurgeon, reported in November 2003, that Plaintiff's examinations showed severely limited range of lumbar motion, positive straight leg raising, and a decreased right knee reflex.  (R. at 394–96.)

On August 26, 2004, Plaintiff reported worsening back pain to Dr. Casto, his family physician.  Examination revealed that he looked uncomfortable and shifted from side to side in the chair.  He had extreme pain upon heel walking.  (R. at 362.)  Plaintiff was subsequently treated with epidural steroid injections.  (R. at 293–99.)

A.  Dr. Zerick

In September 2004, Dr. Zerick, a neurosurgeon, recommended Plaintiff undergo lumbar fixation and fusion surgery at L4-5 (R. at 319), which he performed in February 2005.  (R. at 304–13.)  Following surgery, Dr. Zerick reported that Plaintiff had no radicular pains.  (R at 316–17.)  Plaintiff also attended physical therapy from April to September, 2005. (R. at 328–44. In August 2005, Plaintiff was unable to work his upper extremities without exacerbating his pain. The physical therapist noted "something just isn't right here."  (R. at 330.)

On August 11, 2005, Dr. Zerick reported that Plaintiff was discharged from physical therapy because he was unable to perform upper extremity exercises, such as "triceps pulldowns."  (R. at 315.)  Dr. Zerick also reported that Plaintiff "continues to need a lot of

narcotics, and I have no longer been willing to give him any more Percocet." (*Id.*) Dr. Zerick further reported that plaintiff's lumbar x-rays were "perfect. He has a solid arthrodesis." (*Id.*) Dr. Zerick concluded: "I have some issues that his subjective pain is out of proportion to anything that I see radiographically or objectively. . . . At this point, I suspect that there is nothing left to offer him. Again, I think his symptoms seem to be profoundly out of proportion to anything I see objectively." (*Id.*)

On September 12, 2005, a lumbar myelogram revealed post-operative changes of fusion at L4-5 and mild anterior subarachnoid space in the L3-4. (R. at 323–24.) A CT scan of Plaintiff's lumbar spine taken the same day showed status post fusion at L4-5; central disc bulge at L5-S1 mild disc bulge at L1-2, L2-3 and L3-4; and minimal posterolateral vertebral body spurring suggested at inferior L4 toward the left side. (R. at 325–26.)

That same day, Dr. Zerick reported:

> [Plaintiff] continued to complain of a considerable amount of pain that despite imaging studies and physical exam, his pain seems to be profoundly out-of-proportion and he certainly does seem to be seeking narcotics. At this point, his neurological exam is normal. Lumbar flexion/extension films as well as a lumbar myelogram show no evidence of any neural compression. His screws are in good place and there is no instability. I would recommend that he try to get back to work. I simply don't know what to offer him at this point. I am significantly concerned about his narcotic use.

(R. at 314.)

B. Functional Capacity Evaluation

On September 29, 2005, Dr. Casto recommended that Plaintiff attend a pain clinic and physical therapy, undergo a functional capacity evaluation and attend a work hardening program. (R. at 359.)

Plaintiff underwent a functional capacity evaluation on October 13, 2005. Plaintiff

reported significant low back pain throughout the testing and reported that pain levels increased with almost every activity. The evaluator reported that Plaintiff gave reliable effort and that his observations were consistent with Plaintiff's pain complaints. The evaluator also reported that Plaintiff's demonstrated ability to perform work related activities is severely impaired, that movement patterns were consistent with pain complaints, and that he would be unable to tolerate work at this time because of pain. The evaluator further reported that Plaintiff's functional level at that time was in the sedentary to light physical demand category with restrictions. He recommended a pain program for Plaintiff prior to starting a return to work program. (R. at 373–85.)

C. Dr. Merrill

Plaintiff treated with family-practice physician, Dr. Merrill, from October 20, 2005 to September 5, 2007. (R. at 442–75.) Examinations generally revealed limited range of motion in the lumbar spine and some muscle tightness, but no reported muscle weakness or muscle spasms. (R. at 445-48, 453, 455, 461-62, 472.) Dr. Merrill prescribed pain medication, recommended physical therapy, epidural steroid injections, and probable surgical intervention. In December 2005, January 2006, and September 2006, Dr. Merrill noted that Plaintiff had been disabled since October 20, 2005, but was expected to return to work on May 21, 2006. (R. at 449, 463, 467.) On February 22, 2006, Dr. Merrill reported that Plaintiff was "definitely not able to work" and that he could "hardly sit or stand in the office without pain." (R. at 461.) On March 21, 2006, Dr. Merrill reported that Plaintiff could not perform light duty work and needed to have surgery and physical therapy before he reached maximum medical improvement ("MMI"). (R. at 458–60.) On December 6, 2006, Dr. Merrill reported that Plaintiff was "still hurting" and

could not sleep.  (R. at 447.)  On May 30, 2007, Plaintiff reported he was much better since the second surgery.  Dr. Merrill decreased Plaintiff's pain medication.  (R. at 445.)  On June 29, 2007, Dr. Merrill stated that Plaintiff could not return to his old job and could not perform any type of employment, but was able to participate in vocational rehabilitation services, including work conditioning and job searching.  (R. at 502.)  On September 5, 2007, Dr. Merrill opined that Plaintiff was extremely limited in daily activities including walking, sitting, standing, lifting and carrying.  Dr. Merrill felt that physical therapy did not help and increased Plaintiff's pain.  Dr. Merrill also reported that Plaintiff is probably at MMI.  According to Dr. Merrill, Plaintiff will never be able to do the job that he was doing before his injury which is doing things that he is trained to do.  Dr. Merrill concluded that Plaintiff is 100% disabled.  (R. at 443.)

    D.  <u>Dr. Sybert</u>

On March 21, 2006, Plaintiff saw orthopedic spine surgeon, Dr. Sybert.  Plaintiff told Dr. Sybert that the surgery helped him to stand up better, but he still had back pain that radiated to his legs.  Plaintiff rated his pain at five on a scale of one-to-ten.  Examination revealed a limited range of lumbar motion, flattening of the normal lumbar curve, lumbar muscle spasms and decreased but equal reflexes, a normal gait, normal heel and toe walking, normal sensation, normal straight leg raising and full (5/5) muscle strength.  Dr. Sybert recommended that plaintiff undergo a discogram to evaluate his spine.  (R. at 485–87.)  A CT scan revealed a small annular tear at L2-3, a larger annular tear at L3-4, post-operative changes at L4-5, and disc disruption at L5-S1.  (R. at 400–01.)

On May 23, 2006, Dr. Sybert reported that the discogram showed a marked disruption of the intervertebral disc space at L5-S1 and evidence of previous surgical fusion at L4-5.  Dr.

- 6 -

Sybert suggested that Plaintiff had a pseudoarthrosis that caused pain at L4-5. He recommended that the old surgical fixation be removed and that Plaintiff undergo a new fusion from L4-S1. (R. at 483–84.) On August 28, 2006, Plaintiff underwent a posterior spinal fixation and fusion L4 to S1 with laminectomy decompression, diskectomy; posterior lumbar interbody grafting L5-S1 left with an AVS interbody fusion cage, local bone and infuse bone morphogenic protein; and removal of previously placed Theken fixation at the L4-5 segment with exploration fusion. (R. at 421–22.)

On September 21, 2006, Dr. Sybert reported that Plaintiff is improving and he had a normal motor exam in the lower extremities. His brace is being worn religiously. (R. at 482.) On November 16, 2006, Dr. Sybert reported that Plaintiff was doing quite well and an exam revealed a slow, antalgic gait, but good muscle strength and stable reflexes. Plaintiff was also able to stand on his heels and toes, albeit briefly. X-rays revealed good position and alignment of the fixation and fusion. (R. at 480.) In February 2007, Dr. Sybert reported that Plaintiff no longer had leg pain, his neurologic exam was normal, x-rays showed a solid fusion, and Plaintiff had stopped taking OxyContin. Dr. Sybert would not release him to a heavy lifting occupation. Plaintiff was instructed to seek out a light to sedentary job in the future. (R. at 478–79.)

On May 17, 2007, Dr. Sybert reported that Plaintiff was still taking Percocet, but weaning his use. (R. at 477.)

On September 20, 2007, Dr. Sybert reported that x-rays showed the fusion was solid. Plaintiff's pain was at two on a scale of one-to-ten, but Plaintiff was unable to increase his activity without escalating his pain. Dr. Sybert noted that Plaintiff's pain rose to a level seven or eight during work hardening or conditioning. Dr. Sybert opined that Plaintiff "should seek

permanent disability because of his level of education and training.  He does not have aptitude

for an office-based occupation, and his physical limitations preclude him from working in a

laborer's position to any substantial degree." (R. at 476.)

    E.  Dr. Gahman

    In December 2007, Dr. Gahman, a state agency reviewing physician, reported that

Plaintiff could occasionally lift twenty pounds, frequently lift ten pounds, sit for six hours in an

eight-hour day, and stand/walk for six hours in an eight-hour day.  He could occasionally stoop,

kneel, and crouch, but never crawl or climb ladders, ropes or scaffolds.  Dr. Gahman stated

that the opinion of Plaintiff's treating physician that Plaintiff was disabled from all work activity

was "not supported by the evidence." (R. at 488–95.)

IV.  Expert Testimony

    A.  Medical Expert Testimony

    Dr. Marshall, the medical expert, engaged in a lengthy description of the record and

Plaintiff's continued narcotic use.  (R. at 33–39.)  Dr. Marshall testified that Plaintiff was

disabled through September 2005, when he recovered from his first surgery.  (R. at 41.)  After

that time, Dr. Marshall testified that there was no evidence, from either the physical exams or

from Plaintiff's testimony, that Plaintiff had any radiating pain or radiculopathy.  (R. at 42.)  Dr.

Marshall also testified that, after September 2005, Plaintiff would not have any problem sitting

or standing/walking for six hours a day, but might need a sit/stand option once every two or three

hours.  (*Id.*)  Dr. Marshall further testified that, Plaintiff could perform light work with

occasional bending, stooping, and stair climbing.  He should not be required to climb ladders,

work at unprotected heights, work with jackhammers, or tolerate extremely cold environments.

- 8 -

(R. at 42-43.)

B. The Vocational Expert Testimony

Olsen Dodd, the vocational expert, testified at the oral hearing before the ALJ on October 23, 2008. Mr. Dodd addressed a hypothetical situation of a worker with a residential functional capacity for light work, who could occasionally balance, stoop, kneel, crouch, and crawl. (R. at 47.) The hypothetical worker could not climb ladders, ropes, or scaffolds, and must avoid exposure to extreme cold, vibration, and hazardous heights and machinery. (*Id.*) Mr. Dodd testified that such a worker could perform the work of a small parts assembler, packager, and vacuum tester. (R. at 48.) According to Mr. Dodd's testimony, 16,050 such jobs existed in the regional economy and 379, 500 such jobs existed in the national economy. (*Id.*) Mr. Dodd testified that even if the hypothetical worker required a sit or stand option once an hour, the individual could still perform the relevant positions. (*Id.*)

V.  The Administrative Decision

In the administrative decision, the ALJ found that Plaintiff suffered lumbar degenerative disc disease. As a result of this impairment, Plaintiff was under a disability, from September 30, 2003 through September 30, 2005. The ALJ found medical improvement occurred as of October 1, 2005. From this date, the ALJ found that Plaintiff's claims regarding the intensity of his pain were no longer credible and that Plaintiff was no longer disabled. Accordingly, the ALJ found that, beginning on October 1, 2005, Plaintiff has the residual functional capacity to perform light work, except that he would require a sit/stand option every two hours. Plaintiff should avoid ladders, ropes, or scaffolds. He would be limited to occasional (defined as two hours or one-third of an eight-hour day) climbing of ramps and stairs, balancing, stooping, kneeling,

crouching, and crawling.  He should avoid all exposure to extreme cold, vibration, and hazards including heights and moving machinery.  Beginning on October 1, 2005, Plaintiff would not be able to perform any past relevant work.  Because the vocational expert testified that Plaintiff could perform jobs that exist in significant number in the economy, however, the ALJ found that Plaintiff was not disabled beginning on October 1, 2005.

## VI.  Standard of Review

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'"  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .").  Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial, and the Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision.  *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)).  Nevertheless, "if substantial evidence supports the [Commissioner's] decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley*

*v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).  Finally, even if the Commissioner's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'"  *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## VII.  Legal Analysis

In his statement of errors, Plaintiff raises three issues.  First, he contends that the ALJ failed to provide substantial support that Plaintiff's pain was no longer disabling and that Plaintiff experienced medical improvement related to his ability to work beginning on October 1, 2005.  Second, he asserts that the ALJ's finding that Plaintiff's complaints of pain were no longer credible after October 1, 2005 is without merit. Finally, Plaintiff submits that the ALJ failed to properly weigh the opinions of his two treating physicians, Dr. Merrill and Dr. Sybert, and improperly gave significant weight to reviewing physicians, Dr. Marshal and Dr. Gahman. This Report and Recommendation will address the three issues separately.

### A.  Medical Improvement

Plaintiff's first contention of error is that the ALJ's finding that medical improvement occurred is not supported by substantial evidence.  With regard to this contention, Plaintiff maintains that the ALJ ignored the pain he experienced after September 30, 2005.  (Pl.'s Statement of Errors 5.)  Ultimately, Plaintiff asserts that evidence of Plaintiff's "disabling pain" should have led the ALJ to conclude that any medical improvement did not impact Plaitniff's ability to work and he remained incapable of performing substantial gainful activity.  (*Id.* at

-11-

7–8.)

Because the ALJ concluded that Plaintiff was under a disability, from September 30, 2003 through September 30, 2005, "the central question is whether the claimant's medical impairments have improved to the point where [he] is able to perform substantial gainful activity." *Kennedy v. Astrue*, 247 Fed. Appx. 761, 764 (6th Cir. 2007) (citing 42 U.S.C. § 423(f)(1)). Under the implementing regulations, "[m]edical improvement is any decrease in the medical severity of your impairment(s) which was present at the time of the most recent favorable medical decision that you were disabled." 20 C.F.R. § 404.1594(b)(1). Any conclusion of medical improvement "must be based on changes (improvement) in the symptoms, signs and/or laboratory findings associated with [Plaintiff's] impairment(s)." *Id.* Medical improvement will be related to an individual's ability to work, and thus relevant to the Commissioner's decision, "if there has been a decrease in the severity . . . of the impairment(s) present at the time of the most favorable medical decision and an increase in [Plaintiff's] functional capacity to do basic work activities . . ." 20 C.F.R. § 404.1594(b)(3). Finally, the Commissioner must still determine whether Plaintiff is able "to engage in substantial gainful activity." 20 C.F.R. § 404.1594(b)(5).

In this case, the ALJ concluded that, beginning on October 1, 2005, Plaintiff had medical improvement related to his ability to perform work. (R. at 19–22.) Furthermore, the ALJ determined "[a]fter careful consideration of the entire record . . . beginning on October 1, 2005, the claimant has had the residual functional capacity to perform light work . . ." (R. at 20.) Finally, based on the testimony of the vocational expert, the ALJ decided that starting on October 1, 2005 Plaintiff was able "to perform a significant number of jobs in the national

-12-

economy." (R. at 22.)

After review of the record, the undersigned finds that substantial evidence supports the Commissioner's decision regarding Plaintiff's medical improvement and ability to work. Dr. Zerick's September 2005 evaluation, the October 13, 2005 functional capacity evaluation, Dr. Marshall's testimony, and Plaintiff's own testimony regarding his lifting ability combine to indicate that Plaintiff's condition improved after the April 2005 surgery to the point where he could have performed some forms of work. For example, Dr. Zerick performed various tests following his first surgery that led him to conclude that Plaintiff "should try to get back to work." (R. at 314.) The functional capacity test, although demonstrating that Plaintiff experienced pain, also concluded that Plaintiff could perform sedentary to light work with some restrictions. (R. at 373–74.) Furthermore, the vocational expert's testimony demonstrated that a number of jobs existed for a person in Plaintiff's position. (R. at 47–48.)

Plaintiff is correct that portions of the record indicate that he was still experiencing pain after the closed disability period, necessitating a second surgery that Dr. Sybert performed. Nevertheless, Plaintiff misinterprets the ALJ's decision to the extent he asserts that the ALJ found that "Plaintiff's disabling pain simply disappeared." (Pl.'s Statement of Errors 5.) Rather, the ALJ found that while Plaintiff's impairments could produce the alleged pain, the intensity of the pain was inconsistent with the residual functional capacity assessment. (R. at 20.) The ALJ's decision is supported by substantial evidence in the record, including a January 11, 2006 report following an independent medical examination, during which Dr. Cremer performed a physical examination of Plaintiff. (R. at 388.) Ultimately, although portions of the record might support an opposite conclusion, the undersigned finds that enough evidence exists for a

-13-

reasonable mind to accept the ALJ's determination that Plaintiff had achieved medical improvement.

    B. <u>Plaintiff's Credibility</u>

Plaintiff's second contention challenges the ALJ's finding on the credibility of Plaintiff's subjective complaints of pain. The ALJ found that "claimant's statements concerning the intensity, persistency and limiting effects of these symptoms are not credible beginning on October 1, 2005 . . ." (R. at 20.) Once again, Plaintiff maintains that the record does not support the ALJ's finding.

As the United States Court of Appeals for the Sixth Circuit has noted, "'[C]redibility determinations with respect to subjective complaints of pain rest with the ALJ.'" *Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 652 (6th Cir. 2009) (quoting *Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir.1987)). Furthermore, "[t]he ALJ's assessment of credibility is entitled to great weight and deference, since he [or she] had the opportunity to observe the witness's demeanor." *Infantado v. Astrue*, 263 Fed. Appx. 469, 475 (6th Cir. 2008) (citing *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997)). Despite this deference, "an ALJ's assessment of a claimant's credibility must be supported by substantial evidence." *Walters*, 127 F.3d at 531. The ALJ's decision on credibility must be "based on a consideration of the entire record." *Rogers*, 486 F.3d at 247 (internal quotation omitted).

The United States Court of Appeals for the Sixth Circuit has developed a two-step process for evaluating a claimant's complaints of pain:

> First, we examine whether there is objective medical evidence of an underlying medical condition. If there is, we then examine: (1) whether objective medical

> evidence confirms the severity of the alleged pain arising from the condition; or
> (2) whether the objectively established medical condition is of such a severity that
> it can reasonably be expected to produce the alleged disabling pain.

*Walters*, 127 F.3d at 531 (quoting *Felisky v. Bowen*, 35 F.3d 1027, 1038–39 (6th Cir. 1994)). In making determinations, "[d]iscounting credibility to a certain degree is appropriate where an ALJ finds contradictions among the medical reports, claimant's testimony, and other evidence." *Id.* Furthermore, in assessing credibility, the ALJ may consider a variety of factors including "the location, duration, frequency, and intensity of the symptoms; . . . [and] the type, dosage, effectiveness, and side effects of any medication taken to alleviate the symptoms . . ." *Rogers*, 486 F.3d at 247.

The record indicates that substantial evidence supports the ALJ's credibility determination. Furthermore, the ALJ explained his decision, making it clear the weight he gave Plaintiff's statements. *See Rogers*, 486 F.3d at 248 (noting that ALJ decisions "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight"). The ALJ applied the correct two-step standard in evaluating Plaintiff's complaints of pain. First, the ALJ determined that "the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms." (R. at 20.) Second, the ALJ found that Plaintiff's statements about the pain's intensity were not credible "to the extent they are inconsistent with the residual functional capacity assessment . . ." (*Id.*)

The ALJ's credibility determination is based on an examination of the record. Specifically, the ALJ cited a variety of evidence to support his conclusion including the results of an independent medical examination on January 17, 2006, Plaintiff's failure to attend physical

therapy appointments, and Dr. Marshall's testimony regarding Plaintiff's physical condition and his concern regarding Plaintiff's narcotic use. (R. at 21.) In a different portion of the decision, the ALJ also cited Dr. Zerick's report of "imaging studies and physical exam showing that his pain seems to be profoundly out of proportion." (R. at 19, 314.) Dr. Zerick also commented that Plaintiff seemed to be seeking narcotics.[2] (*Id.*) Ultimately, the ALJ emphasized that Plaintiff's narcotic use was troubling, stating, "His problem is continued use of narcotic medication." (R. at 21.)

Plaintiff emphasizes that portions of the record indicate that he is still experiencing pain. Nevertheless, evidence supporting an opposite conclusion is not sufficient to reverse the ALJ decision. Because the ALJ decision provides adequate support for the credibility determination, with respect to Plaintiff's subjective complaints of pain, the Court defers to the ALJ on this issue, and finds no reversible error.

C. <u>Medical Opinion Sources</u>

Plaintiff's third and final contention of error is that the ALJ's decision gave improper weight to the opinions of Dr. Marshall and Dr. Graham, two non-treating physicians. Plaintiff also maintains that the ALJ decision did not give proper weight to his two treating physicians Dr. Merrill and Dr. Sybert.

Generally, the ALJ gives deference to the opinions of a treating source "since these are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a

---

[2] In his Reply, Plaintiff contends that Zerick's opinion is inherently unreliable because he underwent a second surgery after the one Dr. Zerick performed. Accordingly, Plaintiff maintains that any reliance on Dr. Zerick's opinion is reversible error. Plaintiff provides no legal support for this line of argument, and the undersigned finds that the record does not support such a conclusion.

patient's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone . . ." 20 C.F.R. § 404.1527(d)(2); *Blakley*, 581 F.3d 399, 408 (6th Cir. 2009). To qualify as a treating source, a physician must have "examined the claimant . . . [and have] an 'ongoing treatment relationship' with [the claimant] consistent with accepted medical practice." *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007) (quoting 20 C.F.R. § 404.1502). If the treating physician's opinion is consistent with medically acceptable techniques and substantial evidence in the case record, the ALJ will give the opinion controlling weight. 20 C.F.R. § 404.1527(d)(2).

Even if the ALJ does not afford controlling weight to a treating physician's opinion, the ALJ must still meet certain procedural requirements. *Wilson*, 378 F.3d at 544. Specifically, an ALJ must "always give good reasons in [the ALJ's] notice of determination or decision for the weight [the ALJ] give[s] your treating source's opinion." 20 C.F.R. § 404.1527(d)(2). The United States Court of Appeals for the Sixth Circuit has stressed the importance of this procedural requirement:

> 'The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases,' particularly in situations where a claimant knows that his physician has deemed him disabled and therefore 'might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied.'

*Wilson*, 378 F.3d at 544 (quoting *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir.1999)).

Finally, the Commissioner reserves the power to decide on certain issues, such as whether a patient is disabled. The opinions of treating physicians on such issues are generally not entitled to special significance. *Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007); 20 C.F.R. § 404.1527(e)(3). Nevertheless, "[w]hile controlling weight will not be provided to a

-17-

treating physician's opinion on an issue reserved to the Commissioner, the ALJ must 'explain the consideration given to the treating source's opinion(s).'" *Bass*, 499 F.3d at 511 (quoting SSR 96-5: Policy Interpretation Ruling Titles II and XVI: Medical Source Opinions on Issues Reserved to the Commissioner, 61 Fed.Reg. 34471, 34474 (Soc. Sec. Admin. July 2, 1996)).

In this case, Dr. Sybert and Dr. Merill are treating sources, as both doctors examined and treated Plaintiff regularly over an extended period. On different occasions Dr. Sybert and Dr. Merill both indicated that Plaintiff was potentially disabled. (R. at 443, 476.) On September 20, 2007, after he had performed Plaintiff's second surgery, Dr. Sybert stated that Plaintiff "should seek permanent disability because of his level of education and training." (R. at 476.) Dr. Sybert's based this conclusion on a combination of medical and vocational considerations, stating that Plaintiff's "physical limitations preclude him from working in a laborer's position to any substantial degree." (*Id.*)

An examination of Dr. Merill's records from October 20, 2005 to September 5, 2007 also reveal relevant opinions. For example, after examining Plaintiff on December 6, 2006, Dr. Merill noted that Plaintiff "cannot sit or stand for a very long time, 15 minutes at the most without having to change positions." (R. at 447.) Dr. Merrill also concluded that Plaintiff "is extremely limited in [] aspects of daily activity with walking, sitting, standing, lifting and carrying . . ." (R. at 443.) Ultimately, following Dr. Merill's examination of Plaintiff on September 5, 2007, Dr. Merill concluded that Plaintiff "is 100% disabled I feel for the rest of his life." (R. at 443.)

In determining that, after October 1, 2005 Plaintiff was not disabled, the ALJ failed to articulate the bases for rejecting Plaintiff's treating physicians' opinions and, therefore, failed to

-18-

meet the reason-giving requirement.  The ALJ's decision on Plaintiff's medical improvement and ability to work only briefly mentions Dr. Sybert and the second surgery he performed. Although portions of Dr. Sybert's findings potentially support the ALJ decision, Dr. Sybert's disability judgment, as well as his performance of a second surgery, indicate that Plaintiff was still experiencing considerable pain after the closed period.  Accordingly, the ALJ should have discussed the weight he gave to Dr. Sybert's opinions.

Moreover, the ALJ's decision with respect to Plaintiff's ability to work does not mention Dr. Merill or the weight the ALJ gave his medical opinions.  The omission is important because Dr. Merill's judgments following physical examinations of Plaintiff clearly conflict with the conclusions of the ALJ decision.  Furthermore, although Dr. Merill's examination notes are at times cursory in nature, they are based on his examination, observation, and treatment of Plaintiff's symptoms over a two year period, and, therefore, are not merely a repetition of Plaintiff's assertions.  *Cf. Mitchell v. Comm'r of Soc. Sec.*, 330 Fed. Appx. 563, 570 (6th Cir. 2009) (holding that the good reason rule does not apply when a doctor "merely repeats the patient's assertions").

Defendant points out that Dr. Sybert and Dr. Merill's opinions addressed matters relating to Plaintiff's ability to work about which they have no expertise, and have made disability determinations even though that issue rests in the discretion of the Commissioner.  Even though the ultimate determination of disability lies within the discretion of the ALJ, the ALJ made no attempt to explain the consideration or weight he gave to Dr. Sybert and Dr. Merill's opinions. Instead, the ALJ decision selectively parsed Dr. Sybert's findings and failed to address Dr. Merill's opinions altogether.  *See Germany-Johnson v. Comm'r of Soc. Sec.*, 313 Fed. Appx. 771,

-19-

777 (6th Cir. 2008) (finding remand appropriate where "the judge was selective in parsing the

various medical reports and simply failed altogether to address the findings of [the treating

physician]"). Accordingly, the undersigned finds that the ALJ erred by failing to articulate good

reasons for discounting and/or dismissing the opinions of Plaintiff's treating physicians.

> D. <u>Harmless Error</u>

> The United States Court of Appeals has explained:

> > "'[w]e do not hesitate to remand when the Commissioner has not provided 'good
> > reasons' for the weight given to a treating physician's opinion and we will
> > continue remanding when we encounter opinions from ALJ's that do not
> > comprehensively set forth reasons for the weight assigned to a treating
> > physician's opinion.'"

*Hensley v. Astrue*, 573 F.3d 263, 267 (6th Cir. 2009) (quoting *Wilson*, 378 F.3d at 545). In

*Wilson*, the United States Court of Appeals for the Sixth Circuit remanded the ALJ decision for

failure to comply with the good-reason rule. 378 F.3d at 550. Although it did not actually

decide the issue, the *Wilson* Court opened the door for considerations of whether a violation of

the good-reason requirement was harmless error. *See id.* at 547–48. Specifically, *Wilson*

considered that certain situations might lead to harmless error including "if a treating source's

opinion is so patently deficient that the Commissioner could not possibly credit it . . . [or if] the

Commissioner has met the goal of § 1527(d)(2) . . . even though she has not complied with the

terms of the regulation." *Wilson*, 378 F.3d at 547. Since *Wilson*, the Sixth Circuit has continued

to conduct a harmless error analysis in cases in which the claimant asserts that the ALJ failed to

comply with the good-reason requirement. *See Nelson v. Comm'r of Soc. Sec.*, 195 Fed. Appx.

462, 472 (6th Cir. 2006) (finding that even though the ALJ failed to meet the letter of the good-

reason requirement the ALJ met the goal by indirectly attacking the consistency of the medical

opinions); *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 749 (6th Cir. 2007) (finding that the facts did not satisfy potential harmless error justifications).

Defendant maintains that any violation of the good-reason rule is not reversible under *Wilson* for two reasons. First, Defendant contends that Dr. Merill's opinion was patently deficient. Second, Defendant asserts that the ALJ satisfied the goal of this procedural requirement by indirectly attacking the conclusion that Plaintiff was disabled. The undersigned disagrees.

Defendant contends that Dr. Merill's opinion was patently deficient because it was at odds with other opinions in the record and he was not applying appropriate disability standards. (Def.'s Mem. in Opp'n 25–26.) Nevertheless, the *Wilson* Court set a high threshold for the Commissioner to meet for this type of argument when it contemplated application of the harmless error doctrine. Specifically, the Court concluded that harmless error might apply under a patently deficient rationale if "the Commissioner *could not possibly* credit [the opinion] . . ." *Wilson*, 378 F.3d at 547 (emphasis added). In this case, Dr. Merill's opinions were based on approximately two years of patient examinations and his ongoing relationship with Plaintiff as his primary medical provider. Furthermore, other portions of the record support a finding that Plaintiff was experiencing pain. Dr. Merill's assessments were based in large part on Plaintiff's symptoms and complaints of pain. Accordingly, any conclusion that the ALJ could not possibly credit Dr. Merill's opinions has no merit.

Furthermore, it is not clear that the ALJ satisfied the goal of the procedural requirement in this case. Defendant asserts that the ALJ indirectly attacked Dr. Merill's opinion by concluding that Plaintiff was not disabled. Certainly this is one explanation. Yet, another

explanation exists, namely that the ALJ simply overlooked the opinions of Dr. Sybert and Dr. Merill. The point here is that the matter is altogether unclear because the ALJ failed to provide any insight into his reasoning. Because the ALJ's analysis contains only passing references to Dr. Sybert, and no reference to Dr. Merill or his opinions, the undersigned cannot determine whether the ALJ intended to indirectly attack their opinions. *See Bowen,* 478 F.3d at 749 ("[T]here is not even a passing reference to [the treating physician's] opinion in the ALJ's decision that allows us to infer that the ALJ intended to indirectly attack it."). Thus, Defendant has failed to establish that this is one of the rare cases where failure to satisfy the good-reason requirement is harmless error.

### VII. Conclusion

For the foregoing reasons, it is **RECOMMENDED** that the Court **REMAND** the decision of the Commissioner of Social Security for further proceedings consistent with this Report and Recommendation.

### VIII. Notice

If any party seeks review by the District Judge of this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties objections to the Report and Recommendation, specifically designating this Report and Recommendation, and the part in question, as well as the basis for objection. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Response to objections must be filed within fourteen (14) days after being served with a copy. Fed. R. Civ. P. 72(b).

The parties are specifically advised that the failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and

waiver of the right to appeal the judgment of the District Court. *See, e.g.*, *Pfahler v. Nat'l Latex Prod. Co.*, 517 F.3d 816, 829 (6th Cir. 2007) (holding that "failure to object to the magistrate judge's recommendations constituted a waiver of [the defendant's] ability to appeal the district court's ruling"); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005) (holding that defendant waived appeal of district court's denial of pretrial motion by failing to timely object to magistrate judge's report and recommendation).  Even when timely objections are filed, appellate review of issues not raised in those objections is waived. *Robert v. Tesson*, 507 F.3d 981, 994 (6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to specify the issues of contention, does not suffice to preserve an issue for appeal . . . .") (citation omitted)).


June 9, 2010                                              /s/ *Elizabeth A. Preston Deavers*
                                                         Elizabeth A. Preston Deavers
                                                         United States Magistrate Judge